UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ERIC ORDUNA,

                Petitioner,

v.

TIM GARRETT, *et al.*,

                Respondents.

Case No. 3:20-cv-00641-MMD-CLB

ORDER

## I.  SUMMARY

Petitioner Eric Orduna was sentenced in Nevada state court to life with the possibility of parole after 20 years plus a consecutive sentence of 4 to 10 years after pleading guilty to first-degree murder with the use of a deadly weapon. (ECF No. 17-1.) This matter is before this Court for adjudication of the merits of Orduna's counseled first amended petition for writ of habeas corpus under 28 U.S.C. § 2254, which alleges that: (1) his guilty plea was invalid; and (2) his counsel was ineffective in seeking to withdraw his guilty plea. (ECF No. 16 ("Petition").) For the reasons discussed below, this Court denies the Petition but grants a certificate of appealability for ground 1.

## II.  BACKGROUND

### A.  Factual background[1]

On April 10, 2013, on Sandy Lane in Clark County, Nevada, Abraham Mathew's body was found. (ECF No. 21-3 at 35.) Mathew's hands and ankles were bound with

---

[1]This Court makes no credibility or other factual findings regarding the truth or falsity of this evidence from the grand jury proceedings in state court. This Court's summary is merely a backdrop to its consideration of the issues presented in the Petition. Any absence of mention of a specific piece of evidence does not signify this Court overlooked it in considering Orduna's claims.

1   handcuffs, he had metal tubing wrapped around his neck, and he was covered by a piece

2   of carpet and a shower curtain. (*Id.* at 38-40.) An autopsy revealed that Mathew died from

3   blunt force trauma to the head. (*Id.* at 17, 22-23.)

4        Mathew's car was found in a parking lot a few months later. (*Id.* at 42-43.)

5   Following the location of Mathew's car, Amber Montoya called the police with information

6   about the car. (*Id.* at 47, 95.) During a police interview with Montoya, she explained that

7   around April 8, 2013, Mathew "offer[ed] her $500 and his car for her and some girl named

8   Tamara to have sex with [him]." (*Id.* at 99.) Later, after Montoya "figure[d] out [Mathew

9   was] not going to give her the car . . . if she ha[d] sex with him," she went to Orduna for

10  help. (*Id.* at 99-100.) Orduna tried to force Mathew to sign the car title over to Montoya.

11  (*Id.* at 108.) Orduna and another individual, Jonathan Reyes, held Mathew against his will

12  and eventually kill him. (*Id.* at 104-05.) Montoya helped Orduna load Mathew's body into

13  the trunk of a car and dump the body on Sandy Lane. (*Id.* at 105.) Another witness, Crystal

14  Jaquez, testified that Orduna told her that he killed Mathew. (*Id.* at 69.) And Montoya told

15  Jaquez that Orduna "turned [her] into a murderer." (*Id.* at 72.)

16       **B.    Procedural background**

17       Orduna, Reyes, and Montoya were indicted for conspiracy to commit kidnapping,

18  first-degree kidnapping resulting in substantial bodily harm with a deadly weapon,

19  conspiracy to commit robbery, robbery with the use of a deadly weapon, conspiracy to

20  commit murder, and murder with the use of a deadly weapon. (ECF No. 21-4.) The

21  prosecution filed a notice of intent to seek the death penalty against Orduna. (ECF No.

22  21-13.)

23       Orduna pleaded not guilty, and a trial was set to start on April 4, 2016. (ECF No.

24  24-16.) On the morning of trial, before the jury panel was brought into the courtroom,

25  Orduna's counsel indicated that "there had [not] been any offers ever relayed to Mr.

26  Orduna through the pendency of this case." (*Id.* at 5.) However, on Friday, three days

27  earlier, "the State agreed to allow Mr. Orduna to plead straight up to [all the charges] and

28  they would take death off the table." (*Id.* at 6.) Orduna's counsel explained that the

2

defense had previously indicated to the prosecution that Orduna would seriously consider: (1) a plea offer of second-degree murder with a sentence of 10 to 25 years in prison, which is the plea offer that Reyes was offered and accepted; or (2) a plea offer of voluntary manslaughter, which is the plea offer that Montoya was offered and accepted. (*Id.* at 6-7.) Orduna's counsel countered the Friday plea offer with second-degree murder with a stipulated sentence of 18 years to life. (*Id.* at 7.) The prosecution denied the counteroffer. (*Id.*) Orduna's counsel then countered with first-degree murder with the possible sentence of life without the possibility of parole taken off the table. (*Id.* at 7-8.) The prosecution also rejected that counteroffer. (*Id.* at 8.)

After the state court went through its preference for objections for cause to the jury panel, the proceedings were paused. (*Id.* at 9.) Orduna's counsel then informed the state court that a new offer had just been made and asked for "a few minutes in private with Mr. Orduna [to] discuss it." (*Id.* at 9-10.) The state court responded, "I don't want you to rush through your discussions, but . . . we were supposed to start at 9:30. Now, we're at almost 11:00; okay? But if we're moving forward and it looks like there's some progress, then please take your time." (*Id.* at 11.) The state court took a recess from 10:53 a.m. to 11:06 a.m. (*Id.*)

Following the recess, the jurors were in the courtroom and voir dire began. (*Id.*) During a bench conference during voir dire, the prosecution stated that "just so you know, we left the offer open to the end of lunch." (*Id.* at 56.) A lunch break was taken at 1:05 p.m. (*Id.* at 115.) The proceedings resumed at 3:22 p.m. without the prospective jurors. (*Id.*) Orduna's counsel then indicated that Orduna was going to change his plea: "[h]e will be pleading to one count of guilty to murder with use of a deadly weapon. The State has agreed to retain the right to argue at sentencing, but will not seek the death penalty, nor a sentence of life without the possibility of parole." (*Id.*) Orduna's counsel also explained that "Mr. Orduna is maintaining his position that he did not take any object and hit it over Mr. Mathews' head," but Orduna "understands his liability under the alternative pleadings

in the Indictment."[2] (*Id.* at 117.) An amended indictment, charging Orduna with first-degree murder with the use of a deadly weapon, and Orduna's guilty plea agreement were filed in open court during the proceedings. (ECF Nos. 24-14, 24-15.)

The state court then canvassed Orduna on his guilty plea. (ECF No. 24-16 at 119.) Under that canvass, Orduna stated that, *inter alia*, (1) he wished to enter into the negotiations, (2) no one forced him to plead guilty, (3) no one threatened him to plead guilty, (4) he understood the possible sentences,[3] (5) he understood sentencing was up to the state court, (6) he signed the plea agreement, (7) he read and understood the plea agreement, (8) his counsel answered any questions he had, (9) he was "[v]ery satisfied" by his counsel's services, (10) no other promises had been made to him, and (11) he entered his plea freely and voluntarily. (*Id.* at 119-125.) Notably, after the state court read the charge and various alternative theories of liability from the amended indictment, it asked "[d]id you do those things," and Orduna did not say anything. (*Id.* at 124.) His counsel stated, "[t]hat's what you're admitting to right now" and "[t]hat's just a 'yes.'" (*Id.*) Orduna then said, "[y]es." (*Id.*) The state court found that Orduna's plea was entered freely and voluntarily. (*Id.* at 125.)

Four days later, Orduna attempted to file a *pro se* motion to withdraw his guilty plea. (ECF No. 24-19.) In his motion, Orduna explained that he "only plead guilty in open court because he did not understand exactly what was happening and because the stress and strain of having to make such a quick decision in such a short time caused [him] to

---

[2]The Indictment charged Orduna with murder until three theories of liability: (1) directly committing the crime, (2) aiding or abetting in the commission of the crime, or (3) under a conspiracy to commit the crime. (ECF No. 21-4 at 5-6.)

[3]Orduna argues that the plea colloquy done by the state court lent itself to Orduna's misunderstanding about the possible sentences he faced. (ECF No. 45 at 16.) The state court stated that the "possible sentences are life with the possibility of parole beginning at 20 years, or a definite term of 50 years with eligibility of parole at 20 years. And because of the deadly weapon enhancement, I would have to give you a consecutive term of - - maximum term of 20 years, minimum term of one year." (ECF No. 24-16 at 121.) Orduna alleges that he misunderstood this to mean that the maximum aggregate sentence he would receive was 20 years. (ECF No. 45 at 16.)

4

have a mental breakdown." (*Id.* at 4.) Orduna also explained, "after almost three years of waiting for a trial, I completely lost sense of what was happening and can't even remember saying the words because I was in some sort of altered mental state based on the fast moving change of events." (*Id.* at 5.) Indeed, it was not until Orduna returned to the jail and "took a look at the Guilty Plea Agreement" that he "slowly began to understand . . . that [he] was the only one [out of his co-defendants] facing life in prison." (*Id.*) As such, after being relieved of "the tension and stress and oppression of being in the court room [and] being demanded to enter a plea [or] face the death penalty for something [he] did not do," Orduna wished to go to trial. (*Id.*)

Orduna was appointed new counsel (hereinafter "post-plea counsel") following the filing of his motion. (*See* ECF No. 24-24.) Orduna's post-plea counsel filed a supplement to Orduna's motion, and the prosecution filed an opposition. (ECF Nos. 24-27, 24-30.) An evidentiary hearing was held on Orduna's motion on March 3, 2017. (ECF No. 24-31.)

One of Orduna's counsel who represented him before and during his change of plea (hereinafter "pre-plea counsel 1") testified, *inter alia*, that (1) negotiations by way of passing of notes and whispering were happening contemporaneous with jury selection on April 4, 2016, (2) during the lunch break the new offer taking life without the possibility of parole off the table was discussed with Orduna in a holding cell, (3) he asked the prosecution for more time to consider the offer, but the prosecution refused, making it clear "that this was a now or never situation," (4) following the lunch break, the prosecution provided the written guilty plea agreement, (5) the state court, via the marshal, was pressuring him for information about negotiations because the jury was waiting outside following their return from the lunch break, (6) Orduna called his office the next day and during an in-person meeting a few days later, Orduna stated "that he didn't understand that he was still exposed to being in prison for life," (7) before pleading guilty, he "[a]bsolutely" explained to Orduna how he could be liable under a conspiracy or aiding and abetting theory of liability, and (8) he believed Orduna was being truthful when he

conveyed "that he did not understand what he was doing at th[e] time" of the change of plea. (*Id.* at 16, 28, 32-34, 36–37, 39-41, 73, 76.)

Orduna's other counsel who represented him before and during his change of plea (hereinafter "pre-plea counsel 2") testified, *inter alia*, that (1) Orduna "always maintained that he did not strike the fatal blow that killed" Mathew, (2) Orduna understood the alternative theories of liability and she had no reason to doubt Orduna when he told her that he was willing to accept responsibility for the killing under a conspiracy, aiding and abetting, or felony murder theory of liability, (3) she got "the final offer of first, with use, but the State won't argue for life without" at 10:51 a.m. the morning of trial but it was not discussed with Orduna until the lunch break in the holding cell, (4) at the time she was discussing the plea offer with Orduna in the holding cell during the lunch break, Orduna "was pensive and he was less talkative than usual," (5) when Orduna asked for her advice about the plea offer, she told him that "[t]he likelihood of these jurors convicting [him] of first degree murder [was] great" and "[a]nytime you're facing the death penalty, . . . and you get an offer that takes death off the table, it's something you need to consider," (6) she spent "probably 30 to 40 minutes" in the holding cell with Orduna during the lunch break before being asked to leave so that Orduna could be taken to lunch, (7) she asked for more time to go over the plea offer with Orduna, but the prosecutor denied the request, stating "[e]ither take it now or it's off the table," (8) following her return from lunch and Orduna being brought back into the courtroom, the prosecutor gave her the printed guilty plea agreement, (9) she read the guilty plea agreement to Orduna, (10) Orduna acknowledged to her that he understood what she had read to him, (11) she talked to Orduna the next day, and Orduna told her "[t]hat he was nervous about what he [had done] and he had questions about it" and "he[ was] not sure of what he had signed," and (12) she agreed that the plea agreement was made in haste. (*Id.* at 92-93, 100–106, 116-117, 126, 136.)

Orduna testified at the hearing, *inter alia*, that (1) he "really didn't comprehend the whole conversation" that he had with counsel in the holding cell during the lunch break

and ultimately did not understand what he was pleading guilty to, (2) although the written guilty plea agreement was read to him, he did not understand it, (3) he thought he was pleading guilty to voluntary manslaughter and would only be sentenced to 1 to 20 years in prison, and (4) during jury selection, he and pre-plea counsel 2 discussed the fact that the jury was "pretty pro death penalty," which was concerning. (*Id.* at 163, 166-167, 182.)

The prosecutor, who was representing the state during the hearing on the motion to withdraw the guilty plea, testified, *inter alia*, that the written guilty plea agreement was given to the defense at the beginning of the lunch break.[4] (*Id.* at 216.)

Following the evidentiary hearing, the state court denied Orduna's motion to withdraw his guilty plea. (ECF No. 24-32.) Orduna was sentenced to life with the eligibility of parole after 20 years plus a consecutive term of 4 to 10 years for the deadly weapon enhancement. (ECF No. 24-34.) Orduna appealed, and the Nevada Court of Appeals affirmed. (ECF No. 17-4.) The Nevada Court of Appeals denied rehearing, and the Nevada Supreme Court denied review. (ECF Nos. 25-14, 25-15.)

Orduna filed a state petition for post-conviction relief. (ECF No. 25-18.) The state court denied Orduna's petition, the Nevada Court of Appeals affirmed, and the Nevada Supreme Court denied rehearing. (ECF Nos. 25-24, 17-8, 25-38.)

Orduna then filed this Petition. (ECF No. 16.) Respondents moved to dismiss, and this Court denied the motion. (ECF No. 33.) The Petition is before this Court for a review of the merits. (ECF Nos. 36 (Respondents' answer), 45 (Orduna's reply).)

## III.   GOVERNING STANDARD OF REVIEW

28 U.S.C. § 2254(d)[5] sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

---

[4]According to the video record of the April 4, 2016, proceedings, although the prosecutor may have emailed the guilty plea agreement to Orduna's counsel at an earlier time, Orduna's counsel did not yet have the printed guilty plea agreement at the return from the lunch break at 3:03 p.m. (ECF No. 47 at clip 9.)

[5]Orduna argues that 28 U.S.C. § 2254 is unconstitutional because it violates the Suspension Clause, fundamental principles of separation of powers, the ban on cruel and

1
2
3

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

4
5

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6
7
8

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9
10
11
12
13
14
15
16
17
18
19
20
21
22

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

23
24
25

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101

26
27
28

---

unusual punishments, and the guarantee of due process. (ECF No. 16 at 7.) This Court finds that this argument lacks merit. The Ninth Circuit has stated generally that "[t]he constitutional foundation of § 2254(d)(1) is solidified by the Supreme Court's repeated application of the statute." *Crater v. Galaza*, 491 F.3d 1119, 1129 (9th Cir. 2007).

(2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.    Ground 1—validity of guilty plea

In ground 1, Orduna alleges that his rights to due process under the Fifth, Sixth, and Fourteenth Amendments were violated because his guilty plea was not knowing, intelligent, and voluntary. (ECF No. 16 at 8.) Orduna explains that his plea was made in open court amid jury selection in a capital trial, there was relatively little time to mull over the consequences of entering a plea that could result in him spending the rest of his life in prison, the prosecution refused his request for a mere evening continuance to consider the offer, he did not fully understand the concept of alternative liability in the context of the plea and its attendant consequences, he maintained his innocence up to and through his plea canvass, and his desire to withdraw his guilty plea was almost instantaneous. (*Id.* at 12-13.) Orduna also alleges that his mental health condition prevented him from being able to enter a guilty plea voluntarily and knowingly, his guilty plea was the product of impermissible prosecutorial misconduct amounting to coercion, and he did not understand the plea's essential elements. (ECF No. 45 at 22, 24.)

### 1.    A guilty plea must be knowing, intelligent, and voluntary

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v.*

*Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. A "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business." *Id.* at 755; *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant"). Although a plea may not be produced "by mental coercion overbearing the will of the defendant," a guilty plea made following "the post-indictment accumulation of evidence [that] convince[s] the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family" is not "improperly compelled." *Brady*, 397 U.S. at 750 (reasoning that "mental coercion" is only found if the defendant "did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty").

### 2.    State court determination

In affirming Orduna's judgment of conviction, the Nevada Court of Appeals held:

> Orduna argues the district court erred by denying his presentence motion to withdraw guilty plea. A defendant may move to withdraw a guilty plea before sentencing, NRS 176.165, and "a district court may grant a defendant's motion to withdraw his guilty plea before sentencing for any reason where permitting withdrawal would be fair and just," *Stevenson v. State*, 131 Nev. 598, 604, 354 P.3d 1277, 1281 (2015). In considering the motion, "the district court must consider the totality of the circumstances to determine whether permitting withdrawal of a guilty plea before sentencing would be fair and just." *Id.* at 603, 354 P.3d at 1281.
> In his motion, Orduna requested to withdraw his guilty plea because he suffered a mental breakdown when considering the plea offer and written plea agreement, he did not have sufficient time to consider the plea offer and agreement, and he did not understand the penalties he faced. Orduna also asserted he should be permitted to withdraw his guilty plea because he had maintained his innocence and sought to withdraw the guilty plea shortly after its entry.
> The district court conducted an evidentiary hearing regarding these issues. The district court found that Orduna's attorneys discussed the plea offer with him and explained the guilty plea agreement to him. The district

court further found that Orduna acknowledged at the plea canvass that he understood the plea agreement and the possible penalties he faced by entry of his guilty plea. The district court noted that Orduna did not have a lengthy period of time to decide whether to accept the plea offer as the State did not agree to hold the offer open overnight, but the time period available to Orduna was sufficient for him to make a knowing and voluntary plea. The district court also found that Orduna understood his legal liability even if he did not administer the fatal blow to the victim and entered a guilty plea that conformed to Orduna's assertions regarding the facts of the case. In addition, the district court found Orduna did not demonstrate his decision to seek withdrawal of his guilty plea a few days after its entry was a sufficient reason to grant Orduna's request. *See id.* at 605, 354 P.3d at 1282 (explaining that entry of a guilty plea is not "a mere gesture, a temporary and meaningless formality reversible at a defendant's whim" (internal quotation marks omitted)). Finally, the district court concluded Orduna's testimony at the hearing demonstrated he merely wished to alter the plea agreement so that he would face a shorter prison sentence and did not wish to withdraw his plea entirely.

The district court found, based on the totality of the circumstances, Orduna failed to demonstrate a fair and just reason to withdraw his guilty plea, and denied the motion. The record before this court supports the district court's decision and we conclude Orduna has not demonstrated the district court abused its discretion by denying his motion to withdraw his guilty plea. *See Hubbard v. State*, 110 Nev. 671, 675, 877 P.2d 519, 521 (1994).

(ECF No. 17-4 at 2-4.)

### 3.    De novo review is not appropriate

Orduna argues that ground 1 should be reviewed de novo because the state court did not adjudicate the merits of the due process claim of whether his plea was voluntary, knowing, and intelligent. (ECF No. 45 at 30.)

This Court presumes that the Nevada Court of Appeals adjudicated Orduna's claim on the merits. *See Johnson v. Williams*, 568 U.S. 289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits."); *Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Orduna attempts to rebut that presumption by pointing to the fact that his instant constitutional claim regarding the

1   validity of his plea would have to be reviewed de novo, and since the Nevada Court of

2   Appeals only reviewed the denial of the motion to withdraw his guilty plea under an abuse

3   of discretion standard, it did not consider Orduna's instant constitutional claim. (ECF No.

4   45 at 33.) This Court finds Orduna's argument unavailing.

5          The Nevada Supreme Court explained in *Stevenson v. State* that in determining

6   whether to permit withdrawal of a guilty plea, the state court must not "exclusive[ly] focus

7   on the validity of the plea" but "must consider the totality of the circumstances to determine

8   whether permitting withdrawal of a guilty plea before sentencing would be fair and just."

9   354 P.3d 1277, 1281 (Nev. 2015). Because the validity of a plea—Orduna's instant

10  constitutional claim—is subsumed within the "fair-and-just" analysis used to determine

11  whether a guilty plea should be permitted to be withdrawn, it is implicit that the Nevada

12  Court of Appeals adjudicated the validity of Orduna's plea on the merits in determining

13  that the state court did not abuse its discretion in denying the motion to withdraw the guilty

14  under the "fair-and-just" test.

15         Ground 1 will not be reviewed de novo. Rather, lacking a reasoned state-court

16  decision on Orduna's instant constitutional claim, this Court "determine[s] what arguments

17  or theories supported or . . . could have supported, the state court's decision." *Richter*,

18  562 U.S. at 102; *Carter v. Davis*, 946 F.3d 489, 502 (9th Cir. 2019).

19                          **4.     Analysis**

20         During his change of plea canvass, Orduna's answers to the state court's

21  questions provided that (1) no one forced him to plead guilty, (2) no one threatened him

22  to plead guilty, (3) he understood the possible sentences, (4) he signed the plea

23  agreement, (5) he read and understood the plea agreement, and (6) he entered his plea

24  freely and voluntarily. (ECF No. 24-16 at 119-125.) The state court then found that

25  Orduna's plea was entered freely and voluntarily. (*Id.* at 125.) Orduna's answers during

26  his cavass and the state court's finding that Orduna plea was freely and voluntarily made

27  "carry a strong presumption of verity" and "constitute a formidable barrier in any

28  subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see*

12

*also Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a strong presumption of truth."). Moreover, Orduna signed a plea agreement which provided that he understood the consequences of his plea, understood he was waiving and giving up certain constitutional rights and privileges, understood the nature of the charges against him, and signed the plea agreement voluntarily. (ECF No. 24-15.) Additionally, although undoubtedly rushed, Orduna had a total of approximately two hours and fifteen minutes—from approximately 1:05 p.m. to 3:22 p.m.—to consider the plea offer, Orduna had approximately 30 to 40 minutes within that time to discuss the plea offer in the holding cell with counsel, and Orduna's pre-plea counsel 1 read the entire plea agreement to Orduna before he signed it.

This Court acknowledges the other circumstances surrounding Orduna's plea, including, *inter alia*, the following facts: the plea offer expired at the end of the lunch break and requests for an extension were refused; Orduna was facing the death penalty if he did not accept the plea offer; Orduna was not able to read the plea agreement for himself until after entering his plea; Orduna sought to withdraw his guilty plea the day after pleading guilty; Orduna maintained his innocence, only apparently agreeing that he could be found liable under a non-principal theory of liability; Orduna had been steadfast in his refusal to accept a plea offer that contained a life with or without parole sentence; and Orduna apparently had a mental breakdown during the plea discussions and canvass, which was supported by (1) his pre-plea counsel 2's testimony that he was acting unlike himself while they discussed the plea offer in the holding cell and (2) his pre-plea counsel 1's testimony that Orduna was being truthful when he testified at the evidentiary hearing that he did not understand what he was doing at the time of his guilty plea. While these circumstances may certainly have favorably swayed a discretionary finding that allowing Orduna to withdraw his plea was fair and just, which is a finding that this Court is not reviewing, these circumstances fail to rise to the level of demonstrating that Orduna's plea was invalid. Indeed, although these circumstances demonstrate that Orduna was rushed, regretful, and stressed, they do not undermine Orduna's signed guilty plea agreement,

13

answers to the state court's canvass, and state court findings regarding Orduna's plea, which demonstrate that his guilty plea was entered into knowingly, intelligently, and voluntarily. *See, e.g.*, *Doe v. Woodford*, 508 F.3d 563, 571 (9th Cir. 2007) ("Any evidence of mental deficiencies did not undermine the voluntariness of Doe's plea even in light of the alleged limitation to two hours he claims he had to consider the proposed plea agreement.").

Therefore, based on the record and "considering all of the relevant circumstances surrounding" Orduna's plea, Orduna fails to demonstrate that his guilty plea was not valid. *Brady*, 397 U.S. at 748-49. Consequently, the Nevada Court of Appeals' implicit denial of this ground in its broader determination that the state court did not abuse its discretion in denying the motion to withdraw Orduna's guilty plea constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts. Orduna is not entitled to federal habeas relief for ground 1.

### B.    Ground 2—ineffective assistance of counsel

In ground 2, Orduna alleges that his right to counsel was violated because he received ineffective assistance of counsel in seeking to withdraw his guilty plea. (ECF No. 16 at 14.) Orduna explains that his post-plea counsel failed to raise an objection to the violation of the exclusionary rule when the prosecutor testified during the evidentiary hearing; failed to obtain his medical records from his incarceration at the Clark County Detention Center ("CCDC") showing that he had been prescribed medication for depression; failed to obtain his records from his incarceration at CCDC showing that he had been in solitary confinement for 2 years leading up to the plea; failed to prepare him to testify at the evidentiary hearing; neglected to watch the video of the April 4, 2016, proceedings; and failed to argue prosecutorial misconduct regarding the prosecution's last-minute, take-it-or-leave-it offer. (*Id.* at 20-22.)

#### 1.    Effective assistance of counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to

demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## 2.     Procedural default

This Court previously determined that ground 2 was technically exhausted because it would be procedurally barred in the state courts. (ECF No. 33 at 6.) Orduna previously argued that he could demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse the procedural default. (ECF No. 31 at 9.) This Court deferred consideration of whether Orduna could demonstrate cause and prejudice under *Martinez* to overcome the procedural default until the time of merits determination. (ECF No. 33 at 6-7.)

Generally, to overcome a procedural default based upon the actual or projected application of an adequate and independent state law procedural bar, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *See, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). Under *Martinez*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the

1    state postconviction proceedings or (b) such counsel was ineffective. Here, Orduna did

2    not have counsel during his state postconviction proceedings. (*See* ECF No. 11 at 2.)

3        To demonstrate "prejudice" under *Martinez*, the petitioner must show that the

4    defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. A claim

5    is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that

6    would warrant issuance of a certificate of appealability. *Ramirez v. Ryan*, 937 F.3d 1230,

7    1241 (9th Cir. 2019). In pertinent part, a claim would warrant issuance of a certificate of

8    appealability, and thus is "substantial" for purposes of *Martinez*, if reasonable jurists could

9    debate the proper disposition of the claim or the issue presented is adequate to deserve

10   encouragement to proceed further. This standard does not require a showing that the

11   claim will succeed, but instead only that its proper disposition could be debated among

12   reasonable jurists. *See generally Miller-El v. Cockrell*, 537 US. 322, 336-38 (2003).

13       The determination of whether Orduna can demonstrate prejudice under *Martinez*

14   is made *de novo*. *See e.g.*, *Ramirez*, 937 F.3d at 1243-44; *see also Visciotti v. Martel*,

15   862 F.3d 749, 768-69 (9th Cir. 2017). If he does so, the claim is then reviewed *de novo*

16   on the merits. *See e.g.*, *Rodney v. Filson*, 916 F.3d 1254, 1258, 1262 (9th Cir. 2019);

17   *Dickins v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).

18                    **3.    Analysis**

19       First, regarding Orduna's argument that his post-plea counsel failed to raise an

20   objection based on the exclusionary rule when the prosecutor testified during the

21   evidentiary hearing, Nevada law specifically allows such testimony. Nevada's

22   exclusionary rule states that "at the request of a party the judge shall order witnesses

23   excluded so that they cannot hear the testimony of other witnesses," but the exclusion of

24   the prosecuting attorney is not authorized. NRS § 50.155(1), (2)(d); NRS § 171.204(1)(c).

25   Because an objection to the prosecutor testifying based on the exclusionary rule would

26   have been futile, Orduna fails to demonstrate that his post-plea counsel was deficient.

27   *See Strickland*, 466 U.S. at 688; *cf. Delgadillo v. Woodford*, 527 F.3d 919, 928 (9th Cir.

28   2008) ("A trial counsel's failure to object to evidence which is inadmissible under state

law can constitute deficient performance under *Strickland*."). Moreover, the prosecutor's testimony that the written plea agreement was given to the defense at the beginning of the lunch break held little value given that the video from the April 4, 2016, proceedings, which was admitted as an exhibit at the evidentiary hearing, showed that the prosecutor emailed the guilty plea agreement to the defense before or at the beginning of the lunch break but did not give the printed guilty plea agreement to the defense until after the lunch break. Thus, Orduna also fails to demonstrate prejudice. *See Strickland*, 466 U.S. at 694.

Second, regarding Orduna's argument that his post-plea counsel failed to obtain his records from CCDC showing that he had been prescribed medication for depression[6] and had been in solitary confinement for two years, Orduna fails to demonstrate prejudice. *See Strickland*, 466 U.S. at 694. In denying Orduna's motion to withdraw his guilty plea, the state court cited a Tenth Circuit case, *Miles v. Dorsey*, and included the following parenthetical: "Although deadlines, mental anguish, depression, and stress are inevitable hallmarks of pretrial plea discussions, such factors considered individually or in aggregate do not establish that [a defendant's] plea was involuntary." (ECF No. 24-32 at 11.) The inclusion of this citation and parenthetical, which discount the mental challenges a defendant faces in pleading guilty in terms of the voluntariness of his plea, belie any argument that the state court would have granted Orduna's motion to withdraw his plea had it been aware that Orduna was taking medication for depression or had been in solitary confinement.

Third, regarding Orduna's argument that his post-plea counsel failed to prepare him to testify at the evidentiary hearing, Orduna again fails to demonstrate prejudice. *See Strickland*, 466 U.S. at 694. It is mere speculation that further preparation would have

---

[6]In Orduna's presentence investigation report, he "stated he ha[d] been prescribed medication for depression since he ha[d] been at Clark County Detention Center." (ECF No. 27-1 at 4.)

1    changed the believability[7] of Orduna's testimony or had any effect on the state court's

2    decision. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is

3    not established by mere speculation.").

4        Fourth, regarding Orduna's argument that his post-plea counsel neglected to

5    watch the video of the April 4, 2016, proceedings, at the end of the evidentiary hearing,

6    the state court indicated that "[y]ou'll have a disc burned relating to the April 4th, 2016

7    proceeding, which will be part of the record [and] will be Court's Exhibit Number 3." (ECF

8    No. 24-31 at 239.) The state court then asked if the parties "want[ed] a disc burned," and

9    the prosecutor and Orduna's post-plea counsel answered in the negative, commenting,

10   "[a]s long as it's part of the Court record." (*Id.* at 240.) It appears that Orduna's post-plea

11   counsel could have used the video from the April 4, 2016, proceedings to attempt to

12   impeach the prosecutor's statement that the written plea agreement was given to the

13   defense at the beginning of the lunch break. However, because the video from the April

14   4, 2016, proceedings appears to show that the prosecutor had emailed the guilty plea

15   agreement to the defense before or at the beginning of the lunch break, the impeachment

16   value of the video is questionable. (*See* ECF No. 47 at clip 9.) Accordingly, Orduna fails

17   to demonstrate prejudice. *See Strickland*, 466 U.S. at 694; *see also Doe v. Ayers*, 782

18   F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have

19   done a much better job of impeaching [the witness], . . . but the failures regarding

20   impeachment of [the witness] are of comparatively little consequence").

21       Fifth, regarding Orduna's argument that his post-plea counsel failed to argue

22   prosecutorial misconduct, Orduna's post-plea counsel argued at the evidentiary hearing

23   that the prosecutor "would not give [the defense] the afternoon to present [the offer] to

24   their client." (ECF No. 24-31 at 228.) The state court considered this argument and

25   rejected it, stating that "the mere fact that the State would not agree to an overnight

26

27       [7]In denying Orduna's motion to withdraw his plea, the state court found that
28   Orduna's testimony that he thought he was pleading guilty to voluntary manslaughter was
     "belied by the record and not credible." (ECF No. 24-32 at 8.)

continuance of the proceedings for Orduna to further review the offer[ ] does not make his plea involuntary or unknowingly entered." (ECF No. 24-32 at 11.) Because (1) Orduna's post-plea counsel did argue prosecutorial misconduct, albeit not in the fashion that Orduna believes he should,[8] (2) the state court rejected that argument, and (3) the Nevada Supreme Court has explained that "time constraints and pressure from interested parties exist in every criminal case," *Stevenson*, 354 P.3d at 1281, Orduna fails to demonstrate that his post-plea counsel was ineffective. *See Strickland*, 466 U.S. at 688, 694.

Finally, regarding Orduna's argument regarding his post-plea counsel's aggregate deficiencies, the state court's denial of Orduna's motion to withdraw his guilty plea was discretionary[9] and apparently an easy decision. (*See* ECF No. 24-32 at 9-10 (state court order providing that it had "no difficulty concluding that Orduna ha[d] failed to present sufficient reasons to permit withdrawal of his plea").) Given that the state court appeared resolute in its denial, even if Orduna's post-plea counsel acted deficiently by not obtaining his records from CCDC, better preparing him to testify at the evidentiary hearing, and not viewing the video of the April 4, 2016, proceedings, Orduna fails to demonstrate that, but for these potential deficiencies, the state court would have granted his motion to withdraw his plea.

Based on the record, Orduna's ineffective-assistance-of-counsel claim is not substantial. Because Orduna fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 2, ground 2 is dismissed.

///

---

[8]Orduna argues that "the behavior of the prosecutors in this case with relation to the plea agreement went beyond merely not leaving the offer open overnight. They knowingly created a situation surrounding the plea offer that was impermissibly coercive." (ECF No. 45 at 65.)

[9]*Wilson v. State*, 664 P.2d 328, 334 (Nev. 1983) ("[A] district court's ruling on a motion to set aside a guilty plea is discretionary and will not be reversed unless there has been a clear abuse of that discretion.").

1

## V.   CERTIFICATE OF APPEALABILITY

2        This is a final order adverse to Orduna. Rule 11 of the Rules Governing Section

3   2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This

4   Court has *sua sponte* evaluated the claims within the petition for suitability for the

5   issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65

6   (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner

7   "has made a substantial showing of the denial of a constitutional right." With respect to

8   claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would

9   find the district court's assessment of the constitutional claims debatable or wrong." *Slack*

10  *v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

11  (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate

12  (1) whether the petition states a valid claim of the denial of a constitutional right and (2)

13  whether this court's procedural ruling was correct. *Id.*

14       Applying these standards, this Court finds that a certificate of appealability is

15  warranted for ground 1. Reasonable jurists could debate whether the circumstances

16  surrounding Orduna's guilty plea demonstrate that it was entered into knowingly,

17  intelligently, and voluntarily. Indeed, Orduna's pre-plea counsel 1 testified at the

18  evidentiary hearing that he was intentionally not involved in the discussion of the written

19  guilty plea agreement with Orduna—instead leaving that duty to Orduna's pre-plea

20  counsel 2—because he "was not of the mindset that what Mr. Orduna was doing [by

21  pleading guilty] was consistent with what he had been saying all up until that point." (ECF

22  No. 24-31 at 75.) Orduna's pre-plea counsel 1 explained that when he spoke with Orduna

23  a few days after Orduna entered his plea, Orduna conveyed to him "that he did not

24  understand what he was doing at that time," and Orduna's pre-plea counsel 1 felt "that

25  that was a truthful representation from his perspective." (*Id.* at 76.) And Orduna's pre-plea

26  counsel 1 also explained that "looking at Mr. Orduna's face [when he was being

27  canvassed], he did not seem to be the same Mr. Orduna for the three years prior. . . . I

28  think that there was a matter of confusion within Mr. Orduna." (*Id.* at 77.) Reasonable

jurists could find that this testimony demonstrating Orduna's confusion during plea negotiations and during the plea canvass coupled with the tight window of time he had to consider the plea offer in his capital case and his prompt request to withdraw his plea undermined the validity of his guilty plea.

A certificate of appealability is not warranted for ground 2.[10]

## VI.    CONCLUSION

It is therefore ordered that the first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 16) is denied.

It is further ordered that a certificate of appealability is granted for ground 1 and denied for ground 2.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 9th Day of February 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

---

[10]Orduna requests that this Court conduct an evidentiary hearing. (ECF No. 16 at 23.) Regarding ground 1 of the instant Petition, Orduna was already granted a thorough evidentiary hearing on his motion to withdraw his guilty plea. Further, this Court has already determined that Orduna is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Shinn v. Ramirez*, 142 S.Ct. 1718, 1734 (2022) (holding that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel" unless the prisoner can satisfy 28 U.S.C. § 2254(e)(2)'s stringent requirements under AEDPA); 28 U.S.C. § 2254(e)(2). Orduna's request for an evidentiary hearing is denied.

21